UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BRENTON D. THOMPSON,

        Plaintiff,

    v.

DANIEL L. WILLIAMS, *et al*.,

        Defendants.

Case No. C06-5476FDB-KLS

REPORT AND
RECOMMENDATION

Noted for October 12, 2007

This matter has been referred to the undersigned Magistrate Judge pursuant to Title 28 U.S.C. §§ 636(b)(1)(A) and 636(b)(1)(B) and Local Magistrates' Rules MJR 1, MJR 3, and MJR 4. This matter comes before the Court on defendants' motion to for summary judgment (Dkt. #46), plaintiff's motion to file a late response brief (Dkt. #53) and motion to file an overlength brief (Dkt. #54) with respect thereto, and plaintiff's own motion for summary judgment (Dkt. #47). Having reviewed the above motions, the parties' responses and replies thereto, and the remaining record, the undersigned submits the following report and recommendation for the Honorable Franklin D. Burgess' review.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves a civil rights action under 42 U.S.C. § 1983 brought by plaintiff, alleging that defendants violated his First Amendment right to freely exercise his religion, his Fourteenth Amendment

right to equal protection under the law, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Specifically, plaintiff alleges defendants refused to provide him with a Halal diet, which he claims is a fundamental tenet of his religion, Islam, or, in the alternative, with a Kosher diet, which he also claims to be acceptable according to his faith. Instead, plaintiff alleges defendants provided him with an ovo-lacto vegetarian diet, which he asserts is insufficient to satisfy the fundamental tenets of his religion. See Complaint (Dkt. #5). He seeks both declaratory and injunctive relief, as well as compensatory and punitive damages. See Id.

On June 19, 2007, defendants filed their motion for summary judgment, which they noted for July 13, 2007. (Dkt. #46). Plaintiff filed his own motion for summary judgment on June 25, 2007, which was noted for July 20, 2007. (Dkt. #47). On July 13, 2007, the day their motion for summary judgment was noted for consideration, defendants filed both a response to plaintiff's summary judgment motion (Dkt. #51), and a reply to his response to their own motion (Dkt. #52), stating that he did not serve them with his response until that very day. As such, defendants argue plaintiff's response should not be considered, but instead should be stricken from the record as untimely.

On July 16, 2007, the Court received a copy of plaintiff's response, which appears to have been signed on July 6, 2007, along with his motion to file a late response brief (Dkt. #53), his motion to file an overlength brief (Dkt. #54), and an affidavit of service by mail, in which plaintiff states he mailed each of these documents to defendants and the Court on July 6, 2007 (Dkt. #55). Defendants filed a response to plaintiff's motions to file a late response brief and overlength brief on July 26, 2007, arguing they should be denied as untimely as well. (Dkt. #56). On August 6, 2007, plaintiff's reply thereto was received by the Court, in which he claims his motions were timely. (Dkt. #57). To date, plaintiff has not filed a reply to defendants' response to his motion for summary judgment.

Defendants' resistance to the late filing of plaintiff's response to their summary judgment motion, and to his motions to file a late response brief and an overlength brief, are not well taken. First, as noted above, the record indicates plaintiff signed and dated his response and the two motions on July 6, 2007. See (Dkt. #52-#54). Also as noted above, it appears plaintiff deposited those documents in the prison mail system on that date as well. (Dkt. #55). Defendants – though they argue plaintiff's response to their summary judgment motion and his two motions with respect thereto are not timely – do not challenge his

1  claim that he signed and deposited in the mail the above motions and response on July 6, 2007, nor does

2  the record indicate that he did not do so.

3      In the federal *habeas corpus* arena, "petitions are deemed filed when the pro se prisoner delivers

4  them to prison authorities for forwarding to the Clerk of the Court." <u>Smith v. Duncan</u>, 297 F.3d 809, 814

5  (9th Cir. 2002).  With respect to notices of appeal filed by *pro se* prisoners regarding their *habeas corpus*

6  petitions, furthermore, the Supreme Court also has held that filing occurs "on the day" the notice of

7  appeal is delivered "to prison authorities for forwarding to the district court." <u>Faile v. Upjohn Co.</u>, 988

8  F.2d 985, 987 (9th Cir.1993) (citing <u>Houston v. Lack</u>, 487 U.S. 266 (1988)).  This standard, as applied by

9  the <u>Smith</u>, <u>Faile</u> and <u>Houston</u> courts, is known as the "prison mailbox" rule.

10     Indeed, the Ninth Circuit has applied the "prison mailbox" rule and the rationale behind <u>Houston</u>

11 to other areas of prisoner civil litigation:

12     In so holding, the [<u>Houston</u>] Court barred application of the general rule that, in
       determining the timeliness of appeal under [Federal Rule of Appellate Procedure]
13     Fed.R.App.P. 4(a)(1), "filing" occurs only upon receipt by the district court.

14     The Court noted that, for the ordinary civil litigant, receipt rather than formal "filing"
       determines timeliness because the litigant lacks control over the notice once it is in the
15     district court's possession. *Houston*, 487 U.S. at 273, 108 S.Ct. at 2383. The pro se
       prisoner, with neither the freedom to deliver the notice himself, nor counsel to deliver it
16     for him, surrenders control even earlier in the process than the ordinary litigant. *Id.* at
       271, 273-74, 108 S.Ct. at 2382, 2383-84. Absent the rule in *Houston*, the pro se
17     prisoner's right to appeal would depend entirely upon the diligence both of the prison
       authorities in promptly mailing the notice and of the postal service in timely delivering
18     it. *See Id.* at 275-76, 108 S.Ct. at 2384-85. Thus, the rule in *Houston* relies on policy
       concerns surrounding the pro se prisoner's lack of control over delays between prison
19     authorities' receipt of the notice and its formal "filing" by the district court.

20     Recognizing that these policy concerns apply to other procedural deadlines, courts in
       other circuits have held that delivery to prison authorities constitutes "filing" under
21     rules in addition to Fed.R.App.P. 4(a)(1) governing notices of appeal. *See Simmons v.
       Ghent*, 970 F.2d 392, 393 (7th Cir.1992) ( *Houston* "applies to other filings, including a
22     Rule 59(e) motion"); *Lewis v. Richmond City Police Dept.*, 947 F.2d 733 (4th Cir.1991)
       (filing of complaint for purposes of statute of limitations); *Dunn v. White*, 880 F.2d
23     1188, 1190 (10th Cir.1989) (filing of plaintiff's objections to magistrate's report and
       recommendation), *cert. denied*, 493 U.S. 1059, 110 S.Ct. 871, 107 L.Ed.2d 954 (1990);
24     Smith v. Evans, 853 F.2d 155, 161-62 (3d Cir.1988) ([Federal] Rule [of Civil
       Procedure ("Fed. R. Civ. P.")] 59(e) motion for reconsideration); *Moskovits v. Drug
25     Enforcement Agency*, 774 F.Supp. 649, 653 (D.D.C.1991) (response to agency
       regarding claim to currency under forfeiture).

26
       In this circuit, we have not yet held that *Houston* applies to procedural deadlines other
27     than for civil notices of appeal. Nonetheless, our decisions have evinced a pragmatic
       approach in applying the decision's rule in circumstances other than those presented in
28     *Houston* itself-a pro se prisoner appealing the denial of a writ of habeas corpus. In our
       subsequent cases, our main concern has been whether the circumstances involve the

same lack of control over timeliness described in *Houston*.

For example, focusing on "the broad language of *Houston* and its important policy concerns," and noting that "[p]ro se prisoners experience similar difficulties in filing appeals from non-habeas civil suits," we have held that the rule in *Houston* cannot be confined to habeas petitioners. *See Hostler v. Groves*, 912 F.2d 1158, 1160-61 (9th Cir.1990), *cert. denied*, 498 U.S. 1120, 111 S.Ct. 1074, 112 L.Ed.2d 1180 (1991). We have also concluded that a prisoner whose counsel has not been technically discharged may nonetheless invoke the rule in *Houston* if he can show that his counsel has abandoned him; the decision rested on our conclusion that the inmate abandoned by counsel is "in the same position as the pro se prisoners described in *Houston*." *See Vaughan v. Ricketts*, 950 F.2d 1464, 1467 (9th Cir.1991).

When we have declined to apply *Houston*, we have similarly looked to the presence or absence of the policy concerns underlying the Supreme Court's decision. In holding that a prisoner who deposits his notice of appeal in a public mailbox may not rely on the rule in *Houston*, we stated that such a prisoner is distinct from the inmate who "has no choice but to entrust the forwarding of his notice of appeal to prison authorities whom he cannot control and whose interests might be adverse to his." *Miller v. Sumner*, 921 F.2d 202, 203 (9th Cir.1990).[1] Thus, our cases addressing *Houston* have consistently demonstrated a concern with the pro se prisoner's lack of control relative to the ordinary litigant.

With this preeminent concern in mind, we see no reason to treat other civil "filing" deadlines differently than the deadline for filing a civil appeal. In each case, the prisoner proceeding without counsel lacks the ability to ensure prompt receipt by the district court. Under each rule setting out a "filing" deadline, "the moment at which pro se prisoners necessarily lose control over and contact with their [documents] is at delivery to prison authorities, not receipt by the clerk." *See Houston*, 487 U.S. at 275, 108 S.Ct. at 2384. The policy reasons for deeming submission to prison authorities "filing" apply with equal persuasive force to required filings other than notices of appeal.

Similarly, as regards application of the *Houston* rule, there is no meaningful distinction between "service" deadlines and those for "filing." . . . As with "filing," the pro se prisoner who submits his documents to prison authorities surrenders control earlier than the ordinary litigant. In the case of "service," the moment at which pro se prisoners necessarily lose control over and contact with their documents is at delivery to prison authorities, not a deposit in the public mails. We therefore hold that an incarcerated pro se litigant completes "service" under Fed. R. Civ. P. 5(b) upon submission to prison authorities for forwarding to the party to be served.[2]

Faile, 988 F.2d at 987-88, disapproved of on other grounds, McDowell v. Calderon, 197 F.3d 1253 (9th Cir.1999) (en banc).

Here, because defendants noted their motion for summary judgment for July 13, 2007, under Faile

---

[1]Footnote 3 reads in relevant part as follows: "Of course, our decision in *Miller* neglects to recognize that a pro se prisoner who uses a public mailbox in connection with his filing of an appeal is still not in the same position as an ordinary civil litigant. '[I]f other litigants do choose to use the mail, . . . they can follow its progress by calling the court . . . , knowing that if the mail goes awry they can personally deliver notice at the last moment. . . .' *Houston*, 487 U.S. at 271, 108 S.Ct. at 2382."

[2]Footnote 4 reads as follows: "As a technical matter, because service is complete upon mailing, we hold that a pro se prisoner completes the 'mailing' of a document being served under Fed.R.Civ.P. 5(b) by submitting it to prison authorities."

plaintiff's response was timely filed and served when he deposited it in the prison mail system – i.e., when he submitted it to prison authorities – on July 6, 2007. The same is true with respect to plaintiff's motion to file a late response. Indeed, it would appear that plaintiff's motion to file a late response is moot, as his response was timely filed and served as explained above. Therefore, while that motion (Dkt. #53) should be denied as being moot, the undersigned shall consider plaintiff's response.

Even if the <u>Houston</u> rationale were not applicable in this case, and plaintiff's response was deemed to be untimely, the undersigned would still find plaintiff had set forth valid reasons for seeking to file his response late, and find for him on equitable grounds. For example, in his motion to file a late response, plaintiff states his ability to prepare his response was significantly limited due to the fact that his access to his prison's law library was limited to no more than three hours per week. Given such limited access to legal resources, and the expertise and legal resources available to defendants and their counsel, granting plaintiff's request for a three-day extension is not unreasonable.

As to plaintiff's motion to file an overlength brief, defendants argue that pursuant to Local Rule CR 7(f), it should have been presented to the Court no later than three days prior to the due date for hearing their summary judgment motion. Be that as it may, again, applying the rationale of <u>Houston</u>, the motion would be deemed to have been filed on July 6, 2007, <u>seven</u> days prior thereto. Even absent the <u>Houston</u> rationale, once more issues of fairness favor granting plaintiff's motion. For example, plaintiff states the need for the motion arises from the fact that he had to hand-write the entire response. Indeed, it seems quite clear from the size of his handwriting and the amount of page space actually covered thereby, that had he been able to type his response, it would have been far shorter.

Plaintiff's handwritten response is 27 pages long. As defendants point out, the limit for responses to summary judgment motions is 24 pages. <u>See</u> Local Rule CR 7(e)(3). Given the fact that as typewritten, plaintiff's response likely would be far shorter than the 24-page limit, defendants' point again is not well taken. Nor is defendants' argument that they would be prejudiced by having the Court consider plaintiff's response in its entirety. Given that plaintiff's response would have come well within the allotted page limit had it been typewritten, the undersigned fails to see the prejudice involved here. Indeed, defendants point to nothing specifically in the latter part of plaintiff's response that would be particularly prejudicial. As such, the undersigned will not strike the extra three pages of that response, and the Court should grant

1  plaintiff's motion to file an overlength response brief (Dkt. #54).

2      In light of all of the above, and the fact that all other responses and replies to the parties' motions

3  for summary judgment have been filed – except for plaintiff's reply to defendants' response to his motion

4  for summary judgment – and that the time for filing such responses and replies has passed, those motions

5  are now ripe for consideration.

6                              <u>DISCUSSION</u>

7      Summary judgment shall be rendered if the pleadings, exhibits, and affidavits show that there is

8  no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

9  law. Fed. R. Civ. P. 56(c). In deciding whether summary judgment should be granted, the Court must

10 view the record in the light most favorable to the non-moving party and indulge all inferences favorable

11 to that party. Fed. R. Civ. P. 56(c) and (e). When a summary judgment motion is supported as provided

12 in Fed. R. Civ. P. 56, an adverse party may not rest upon the mere allegations or denials of his pleading,

13 but his response, by affidavits or as otherwise provided in Fed. R. Civ. P. 56, must set forth specific facts

14 showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e). If the non-moving party does not so

15 respond, summary judgment, if appropriate, shall be rendered against that party. <u>Id</u>.

16     The moving party must demonstrate the absence of a genuine issue of fact for trial. <u>Anderson v.</u>

17 <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986). Mere disagreement or the bald assertion that a genuine

18 issue of material fact exists does not preclude summary judgment. <u>California Architectural Building</u>

19 <u>Products, Inc. v. Franciscan Ceramics, Inc.</u>, 818 F.2d 1466, 1468 (9th Cir. 1987). A "material" fact is one

20 which is "relevant to an element of a claim or defense and whose existence might affect the outcome of

21 the suit," and the materiality of which is "determined by the substantive law governing the claim." <u>T.W.</u>

22 <u>Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).

23     Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of

24 summary judgment." <u>Id</u>. Rather, the non-moving party "must produce at least some 'significant probative

25 evidence tending to support the complaint.'" <u>Id</u>. (quoting <u>Anderson</u>, 477 U.S. at 290); <u>see also</u> <u>California</u>

26 <u>Architectural Building Products, Inc.</u>, 818 F.2d at 1468 ("No longer can it be argued that any

27 disagreement about a material issue of fact precludes the use of summary judgment."). In other words,

28 the purpose of summary judgment "is not to replace conclusory allegations of the complaint or answer

with conclusory allegations of an affidavit." <u>Lujan v. National Wildlife Federation</u>, 497 U.S. 871, 888 (1990).

I.    <u>Defendant Ahmed</u>

Ismail Ahmad, a former Islamic religious advisor for the Department of Corrections ("DOC"), is named as a defendant in plaintiff's complaint. (Dkt. #5, p. 3, Exhibit M, p. 1; Dkt. #46, p. 2). Plaintiff alleges he wrote to defendant Ahmad, stating that he was being denied a Halal diet and requesting that defendant Ahmad assist him in resolving the issue and ensuring that his First Amendment right to have a religious diet was not infringed. (Dkt. #5, Attachment, p. 1, Exhibit M, p. 1). On October 17, 2006, the Court grant plaintiff *in forma pauperis* status. (Dkt. #4). That same day, the Court ordered service on all of the defendants named in plaintiff's complaint, including defendant Ahmad. (Dkt. #6).

The record indicates service was effected on all of the named defendants, except for defendant Ahmad, whose service forms were returned unexecuted because he apparently no longer worked at DOC. (Dkt. #10). Defendants assert that because defendant Ahmad was not properly served with the complaint, and because more than 120 days have passed since the complaint was filed with the Court, the Court does not have personal jurisdiction over defendant Ahmad, and he should be dismissed from this case without prejudice. Plaintiff has not specifically responded to this issue.

Fed. R. Civ. P. 4 provides in relevant part as follows:

**(m) Time Limit for Service.** If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.

Personal jurisdiction does not attach, unless defendants are served with the complaint in accordance in the manner prescribed by Fed. R. Civ. P. 4. <u>Jackson v. Hayakawa</u>, 682 F.2d 1344, 1347 (9th 1982). "Neither actual notice nor simply naming the person in the caption of the complaint" will subject a defendant to the district court's jurisdiction, "if service was not made in substantial compliance" with Fed. R. Civ. P. 4. <u>Id.</u> (internal citation omitted).

To date, as noted by defendants, more than 120 days have passed since plaintiff filed his complaint with the Court. Plaintiff, as the party initiating this lawsuit, is responsible for prosecuting his case, and, as such, normally is tasked with ensuring that all defendants are properly served in a timely

manner. In this case, however, because plaintiff was granted *in forma pauperis* status, service was made on his behalf by the United States Marshal. The unexecuted service forms for defendant Ahmad, therefore, were returned to the Court and not to plaintiff himself. As such, it is not clear plaintiff had notice that service was never properly made on defendant Ahmad.

That being said, as noted above, plaintiff has not specifically addressed this issue in his response to defendants' summary judgment motion, his own summary judgment motion, or any of the other motions, responses and replies he has filed in connection therewith. The undersigned thus shall presume plaintiff has no objection to the dismissal of defendant Ahmad from this case without prejudice due to the Court's lack of personal jurisdiction over him. Accordingly, the undersigned recommends that the Court so find, and dismiss defendant Ahmad without prejudice.

II.     Genuine Issues of Material Fact Exist with Respect to Plaintiff's First Amendment Claim

To establish his right to freely exercise his religion under the First Amendment has been violated, plaintiff must show defendants "burdened the practice of his religion, by preventing him from engaging in conduct mandated by his faith." Freeman v. Arpaio, 125 F.3d 732, 736 (9th Cir. 1997); Graham v. C.I.R., 822 F.2d 844, 850-51 (9th Cir. 1987) (government action burdens prisoner's practice of religion if he or she is prevented from engaging in conduct mandated by his or her faith). "In order to reach the level of a constitutional violation," furthermore, "the interference with one's practice of religion 'must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine." Freeman, 125 F.3d at 737 (quoting Graham, 822 F.2d at 851).

A.     Conduct Mandated by Plaintiff's Faith

At the outset, however, plaintiff must establish the particular religious conduct or practice at issue is mandated by his faith. This involves two criteria. First, plaintiff must demonstrate that his "proffered belief" is "sincerely held." Malik v. Brown, 16 F.3d 330, 333 (9th Cir. 1994). As observed by the Ninth Circuit, the First Amendment does not extend to religions that "are obviously shams and absurdities and whose members are patently devoid of religious sincerity." Id. (citations and internal quotes omitted). Second, plaintiff must show that his religious exercise claim is "'rooted in religious belief, not in 'purely secular' philosophical concerns.'" Id. (quoting Wisconsin v. Yoder, 406 U.S. 205, 215-16 (1972)). As to this second criteria, determining whether plaintiff's claim is "rooted in religious belief" requires

analyzing whether it is related to his "sincerely held religious belief." <u>Id.</u>

With respect to the above inquiry, the Supreme Court has noted that "[t]he determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task." <u>Thomas v. Review Bd. of Indiana Employment Security Sec. Division</u>, 450 U.S. 707, 714 (1981). Further, since "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection," the resolution of the above question should not "turn upon a judicial perception of the particular belief or practice in question." <u>Id.</u> That is, because "[i]nterfaith differences . . . are not uncommon among followers of a particular creed," and because "the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses," the guarantee of free exercise of religion "is not limited to beliefs which are shared by all of the members of a religious sect." <u>Id.</u> at 715-16. In other words, "[c]ourts are not arbiters of scriptural interpretation." <u>Id.</u> at 716.

In this case, plaintiff alleges he has a sincere belief in the fundamental tenets of Islam. (Dkt. #5, Attachment, p. 2). One of those tenets, according to plaintiff, is maintaining a Halal diet. <u>Id.</u> In addition, plaintiff claims that to abide by this central tenet of his faith, he is commanded to eat all foods which are Halal, including meat properly prepared in a Halal manner. (Dkt. #54-2, pp. 2-6). As support for his claim, plaintiff points to text he appears to have copied from the Qur'an, Islam's primary holy book, in which it is stated: "O you who believe! Eat of the lawful (Halal) things that We have provided you." (Dkt. #5, Exhibit B). This apparently includes meat from properly slaughtered animals. <u>Id.</u> Certainly, it is entirely plausible to read the above text and reasonably interpret it, as plaintiff apparently has done here, as constituting a command to Muslims to eat all things Halal.

Defendants, relying on declarations from the DOC's current religious and food program managers, and on the DOC's own "Handbook of Religious Beliefs and Practices," argue that none of the tenets of Islam actually require plaintiff to eat meat. Defendants further assert that plaintiff himself has cited to no religious mandate that meat is required to be eaten or that any such mandate constitutes a fundamental tenet or belief of Islam. First, however, plaintiff, as discussed above, has pointed to a primary religious source, the Qur'an, for his claim that eating a Halal diet that includes meat is a fundamental tenet of his faith. Defendants have not challenged the accuracy of the portion of religious text copied and provided by plaintiff. Also as discussed above, certainly it is reasonable to read that text as mandating the eating of

all things Halal or prepared in a Halal manner.

Second, in arguing that no tenet of Islam requires plaintiff to eat meat, defendants are inviting the Court to engage in the kind of "scriptural interpretation" of which the Supreme Court has warned should be avoided. See Thomas, 450 U.S. at 716. For example, defendants point out that the DOC Handbook was approved by defendant Ahmad as a member of a voluntary Religious Services Advisory Committee, created to advise the DOC on religious matters. (Dkt. #46-2, Exhibit 2, p. 2). The section on Islam that is contained in the DOC Handbook also apparently is based on and cites to the United States Department of Justice Federal Bureau of Prisons' own Handbook of Religious Beliefs and Practices. Id.

The DOC's religious program manager further states in her declaration that it is her understanding, presumably based at least in part on the DOC Handbook, that while Muslims are forbidden to eat certain foods, no foods actually are mandated to be eaten by Islam. Id. at p. 2-3. She further states that the ovo-lacto vegetarian meals the DOC provides to Muslim inmates meet the religious requirements for Muslims, and that defendant Ahmad himself informed her such meals were sufficient under Islam. Id. as p. 3. The DOC's food program manager also opines in his declaration that the ovo-lacto vegetarian meals meet the religious dietary requirements of Islam. (Dkt. #46-2, Exhibit 3, p. 1).

It is not at all clear, however, that either the religious or the food program manager for DOC, or even defendant Ahmad for that matter, is more qualified to speak to the religious dietary requirements of plaintiff's own faith or of Islam or Muslims in general. No evidence has been provided that any of those individuals is particularly qualified to do so, or has acquired such expertise in Islam and its tenets that they should be deemed experts in the field. The same goes true for both the DOC and the Federal Bureau of Prisons Handbooks. No evidence has been presented as to the religious texts or other sources on which the Federal Bureau of Prisons Handbook relies, and on which the DOC Handbook is based. Even had such a showing been made, however, again, the Court still would be forced to decide which sources, the defendants' or plaintiff's, were more authoritative or accurate on the issue.

Rather, the undersigned finds that this particular issue in essence boils down to the two criteria set forth in Malik: (1) whether plaintiff's belief that the fundamental tenets of Islam require him to partake of all foods that are Halal, including meat, is "sincerely held"; and (2) whether his claim that being limited to an ovo-lacto vegetarian diet violates his First Amendment right to freely exercise his religion is "rooted

in" or "related" to that sincerely held belief. See 16 F.3d at 333. As to the first such criteria, defendants do not contest that plaintiff's beliefs are sincerely held, nor is there anything in the record before the Court which challenges the sincerity of those beliefs. See Id. Second, it is clear that plaintiff's First Amendment claim is rooted in or related to, and indeed is based squarely on, such beliefs.

Defendants appear to focus largely on the language used by the Ninth Circuit in Freeman, wherein the Court of Appeals held that the claimant must demonstrate defendants burdened his practice of religion by preventing him from "engaging in conduct mandated by his faith." 125 F.3d at 737 (emphasis added). However, Freeman did not explain what the phrase "mandated by his faith" meant. On the other hand, as discussed above, it appears the Ninth Circuit in Malik did address this issue, though it did not use the term "mandate" in doing so. Rather, the Court of Appeals found that in determining whether a claim warranted First Amendment protection in the first place, the focus is on whether the religious beliefs were sincerely held and formed the basis for the claim. Particularly in light of the Supreme Court's admonition against scriptural interpretation, Malik makes clear that the determination as to what is "mandated" and whether a a claim is rooted in a sincerely held religious belief are one in the same.

This initial determination, in other words, requires the Court to determine at the outset whether the exercise of the claimant's religious beliefs alleged to have been burdened is mandated by his or her faith. In making that determination, the Court first must decide whether those beliefs are sincerely held by the claimant. As explained above, in this case, plaintiff has shown that his religious beliefs are sincerely held. Next, plaintiff must show that his claim is rooted in, or related to, those beliefs, which clearly it is. As such, the undersigned finds that plaintiff has alleged a religious claim sufficient to merit protection under the First Amendment. This does not necessarily mean, as explained in further detail below, that plaintiff has established defendants impermissibly impinged on his First Amendment right to freely exercise his religion, but rather that he has made it over the first hurdle.

The undersigned recognizes that other federal courts, as pointed out by defendants, have held that ovo-lacto vegetarian diets were in those cases sufficient to meet the religious dietary requirements of the Muslim inmates claiming otherwise, and that such diets did not substantially burden the inmates' exercise of their Islamic faith. See (Dkt. #46, pp. 8-9). Those cases though were not decided on the basis that the religious claims raised therein merited no First Amendment protection, the initial determination that the

1  Court must make before proceeding on the question of whether the right being asserted was violated, and

2  with respect to which, as discussed above, plaintiff has prevailed. Instead, they were decided on the basis

3  that the prison regulations at issue, though found to impinge on the plaintiffs' constitutional rights, were

4  reasonably related to legitimate penological interests, which, as discussed below, requires further analysis

5  under Turner v. Safley, 482 U.S. 78 (1987). In other words, by focusing on these cases at this point in the

6  constitutional analysis, defendants conflate the issue of whether a religious claim merits First Amendment

7  protection in the first place, with the issue of whether the right to freely exercise one's religion under the

8  First Amendment has in fact been violated, and, if so, whether the governmental action that has resulted

9  in such violation was reasonable.[3]

10     B.     The Four *Turner* Factors

11     The right to freely exercise one's religion "is necessarily limited by the fact of incarceration, and

12  may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." O'Lone

13  v. Shabazz, 482 U.S. 342, 348 (1987). To assist in determining how to balance these competing interests,

14  the Supreme Court has held that "[w]hen a prison regulation impinges on inmates' constitutional rights,

15  the regulation is valid if it is reasonably related to legitimate penological interests." Ward v. Walsh, 1

16  F.3d 873, 876 (9th Cir. 1993) (quoting Turner, 482 U.S. at 89). Within the religious diet context,

17  prisoners do "have the right to be provided with food sufficient to sustain them in good health that

18  satisfies the dietary laws of their religion." Ward, 1 F.3d at 877. Thus, whether a "culinary policy is

19  reasonable requires a balancing of the degree of intrusiveness into the right of free exercise against the

20  costs of accommodation, giving appropriate deference to prison officials' assessment of the costs."

21     To further help in the courts in this task, the Supreme Court "set forth four factors to be

22

23     [3]Indeed, in one such cases, Boyd v. Lehman, 2006 WL1442201 (W.D. Wash. May 19, 2006), the district court held as

24  follows: "This authority [Thomas] appears to make clear that where, as here, plaintiff claims to believe that eating halal meat is
   central to the practice of his religion, and defendants do not challenge the sincerity of that belief, the belief is entitled to First

25  Amendment protections. Accordingly, the Court turns to the next part of the analysis which is to consider whether defendants'
   decision to deny plaintiff halal meat and/or kosher meals as a part of his religious diet is rationally related to a legitimate penological

26  purpose." Id. at *4 (citing Turner, 482 U.S. 78). Further, in Phipps v. Morgan, 2006 WL 543896 *6 (E.D. Wash. March 6, 2006),
   after finding the defendants had provided adequate support for their argument that eating Halal meat was not a central tenet of Islam,

27  the district court nevertheless went on to hold that defendants had failed to provide "any reason to doubt" that plaintiff sincerely
   believed Islam required him to eat Halal meat, and thus that it then had to proceed on to determine whether the defendants' failure

28  to provide Halal meat to the plaintiff was reasonable under Turner. See also Williams v. Morton, 343 F.3d 212, 217 (3rd Cir. 2003)
   (because prison officials failed to provide any reason to doubt prisoners sincerely believed Islam required them to eat Halal meat,
   determination had to be made as to whether practice of not providing Halal meat meals was reasonable under  Turner).

considered in determining when a regulation is reasonably related to legitimate penological interests:

> First, there must be a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." Second, whether there are "alternative means of exercising the right that remain open to prison inmates" must be assessed. Third, "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally" must be determined. Fourth, "the absence of ready alternatives" to the regulation must be explored. The "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable."

Id. (citations omitted); see also Overton v. Bazzetta, 539 U.S. 126, 132 (2003). These are known as the "Turner factors," and shall be addressed individually below. See Ward, 1 F.3d at 877.

In making the above determination, however, it must be noted that "substantial deference" is to be accorded "to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton, 539 U.S. at 132. The burden of proof, furthermore, is not on defendants to establish the validity of the challenged regulation, but plaintiff "to disprove it." Id.

### 1. The First *Turner* Factor

As discussed above, the first Turner factor that is relevant to determining the reasonableness of the challenged prison regulation, is whether there is a "valid, rational connection" between that regulation and "the legitimate governmental interest put forward to justify it." Turner, 482 U.S. at 89; see Ward, 1 F.3d at 877 ("The first Turner factor requires us to consider whether there is a logical connection between the policy and the legitimate governmental interest that justifies it."). Thus, where that logical connection "is so remote as to render the policy arbitrary or irrational," the regulation will not be sustained. Turner, 482 U.S. at 89-90. Such is not the case here.

Defendants argue that being required to provide Halal meals would place an unnecessary burden on the DOC in terms of increased financial, administrative and staffing costs and potential security risks. Prisons do have "a legitimate interest in running a simplified food service, rather than one that gives rise to many administrative difficulties." Ward, 1 F.3d at 877. Security and "budget constraints" also "are legitimate penological interests." Williams, 343 F.3d at 217. Plaintiff admits that the federal courts have recognized these constitute legitimate penological interests, but argues defendants have failed to provide any evidence that these interests are the actual bases for their religious dietary policies.

The first Turner factor, however, merely is concerned with whether a rational connection between

the challenged regulation and the legitimate governmental interest put forward to justify it exists. That is, the Court's task here is simply to determine whether defendants have presented a legitimate governmental interest that logically relates to the policy of providing Muslim inmates with ovo-lacto vegetarian meals. Clearly, they have. Defendants assert such meals are the most efficient and cost-effective means of giving Muslim prisoners nutritionally and religiously adequate meals. As noted above, administrative efficiency and cost-effectiveness are legitimate penological interests. Providing Muslim inmates with adequate low-cost, efficient meals thus is rationally related to those interests.

Plaintiff appears to be challenging the legitimacy of defendants' asserted connection between their policy and the interests put forward to justify it on the basis that they have presented no evidence as to the actual costs and security concerns implicated by providing either Halal or Kosher meals. Whether or not there is sufficient evidence in the record regarding the fiscal and administrative impact of accommodating plaintiff's asserted First Amendment right to Halal or Kosher meals, however, is dealt with under the third Turner factor. Again, under the first Turner factor, the Court is merely concerned with whether there is a rational connection between the challenged policy and the stated governmental interests. The undersigned finds that there is for the reasons set forth above.

2.     The Second *Turner* Factor

The Second Turner factor "is whether there are alternative means of exercising the [asserted] right that remain open to prison inmates." Turner, 482 U.S. at 90. However, "[t]he relevant inquiry under this factor is not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected." Ward, 1 F.3d at 877. Rather, the Court must determine whether plaintiff has been "denied all means of religious expression." Id. (emphasis added) Thus, if a prisoner retains "the ability to participate in other significant rituals and ceremonies of" his or her faith, the second Turner factor is likely to be seen as evidence of the reasonableness of the challenged regulation, although "some aspects of religious practice" may have been "impinged upon." Id.

The Supreme Court itself has stated that "[w]here 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'" Turner, 482 U.S. at 90 (citation omitted). "Also relevant to the evaluation of the second factor" is "the distinction between a

religious practice which is a positive expression of belief and a religious commandment which the believer may not violate at peril of his soul," as the Ninth Circuit went on to state:

> It is one thing to curtail various ways of expressing belief, for which alternative ways of expressing belief may be found. It is another thing to require a believer to defile himself, according to the believer's conscience, by doing something that is completely forbidden by the believer's religion.

Ward, 1 F.3d at 878; Ashelman v. Wawrzaszek, 111 F.3d 674, 677 (9th Cir. 1997) (requiring believer to defile himself by doing something completely forbidden by his religion is different from, and more serious than, curtailing various ways of expressing beliefs for which alternatives are available).

According the DOC's religious program manager, Muslims are provided with a variety of options for expressing their religious beliefs:

> DOC has many religious programs and services for Islamic people in prison. There are two work proscription days: Eidul-Fitr (the conclusion of Ramadan when a Muslim is required to dress in clean clothes and attend congregational prayers) and Eidul-Adha (the feast of sacrifice, when Muslims again attend congregational prayers). We also provide special meals and allow the Muslim offenders to meet together to celebrate Eidul-Fitr and Eidul Adha. Sack lunches are provided to accommodate the needs of fasting Muslims during Ramadan. Accommodations are made for the five daily required prayers for Muslim inmates. Muslims are permitted to congregate every Friday for the Jum'ah service. A number of our facilities have hired a Muslim contract chaplain to assist in the religious practice and instruction of the Muslim offenders.

(Dkt. #46-2, Exhibit 2, p. 2). As such, it appears that plaintiff, as a Muslim prisoner, is being given the opportunity to participate in the significant rituals and ceremonies of his religion. In other words, plaintiff is hardly being denied all means of religious expression. Nor does it appear, and plaintiff has not asserted or shown, that not eating Halal meals constitutes the much more serious type of defilement recognized by the Ninth Circuit, that would cause him to go against a religious commandment he "may not violate at the peril of his soul." Ward, 1 F.3d at 878. This factor thus favors defendants as well.

### 3. The Third *Turner* Factor

The third Turner factor considers "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and the allocation of prison resources generally." Turner, 482 U.S. at 90. In analyzing this factor to determine the reasonableness of the challenged regulation, however, the courts should keep in mind that, if accommodating "an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff," they "should be particularly deferential to the informed discretion of correctional officials." Id.

As noted above, defendants argue that the provision of Halal meals would place an unnecessary burden on the DOC. They assert the current ovo-lacto vegetarian meals being provided accommodate plaintiff's religious dietary requirements at the lowest cost to DOC. They claim that being required to provide Halal meals would result in further complicating prison food service, a loss of administrative efficiency, further increases in costs and in the number of staff needed, and the necessity of contracting with additional vendors, which in turn would result in greater security concerns. Defendants rely on the declarations of the DOC's religious and food program managers and on federal case law to support these claims. The undersigned, however, agrees with plaintiff that defendants have failed to provide adequate evidence in the form of sufficiently specific facts for those claims.

First, it is not at all clear that ovo-lacto vegetarian meals are adequate to accommodate plaintiff's religious beliefs. Indeed, as discussed above, plaintiff has shown he has a sincerely held belief that eating a Halal diet, which includes properly prepared meat, is a requirement of his faith. The undersigned is well aware that some federal courts, including some of the decisions cited by defendants, have found providing such meals meets the religious requirements for Muslims. See Abdullah v. Fard, 173 F.3d 854 (6th Cir. 1999) (unpublished decision) (finding prohibition against non-Halal meat can be complied with by eating of vegetarian meals); Cochran v. Schotten, 172 F.3d 47 (6th Cir. 1998) (unpublished decision); Phipps, 2006 WL 543896 at *8. The findings in two of these decisions appear to have been based on declarations or affidavits provided to the Court, containing individual opinions as to the religious dietary requirements for Muslims. See Abdullah, 173 F.3d 854; Phipps, 2006 WL 543896 at *8. In Cochran, furthermore, the Sixth Circuit simply states defendants established such to be the case. 172 F.3d 47.

The undersigned, however, believes that to rely on the declarations and other exhibits provided by defendants to find plaintiff's own religious faith does not require him to eat Halal meals would go against the admonition by the Supreme Court in Thomas, discussed above, that the courts refrain from acting as arbiters of scriptural interpretation. Such judicial restraint also would seem to be more in line with the Ninth Circuit's emphasis in Malik on the need to focus on the prisoner's sincerely held personal religious beliefs in determining whether they are entitled to protection under the First Amendment. Accordingly, the undersigned declines to rely on the above three cases, all of which it further is noted are unpublished decisions, to find ovo-lacto vegetarian meals accommodate plaintiff's religious beliefs.

Indeed, other court decisions, including those cited by defendants, have held that providing ovo-lacto vegetarian meals was permissible, not on the basis that they accommodated the Muslim prisoner's religious beliefs, but because they were a reasonable alternative to providing Halal meat meals based on application of the four <u>Turner</u> factors. <u>See</u> <u>Williams</u>, 343 F.3d at 216-21; <u>Bilal v. Lehman</u>, 2006 WL 3626808 *6-*7 (W.D. Wash., Dec. 8 2006); <u>Boyd</u>, 2006 WL 1442201 at *3-*8; <u>Salaam v. Collins</u>, 830 F.Supp. 853, 859-61 (D. Md. 1993). In other words, the courts in these cases recognized that while the ovo-lacto vegetarian meals provided may not have fully accommodated all of the religious beliefs held by the Muslim prisoners, the policy of providing such meals was reasonable in light of the fiscal costs and other administrative and security impacts shown to be implicated. As such, these courts did not find ovo-lacto vegetarian meals to be religiously adequate according to the tenets of Islam.

It also is not at all clear that providing Halal meals to plaintiff would place an unnecessary burden on the DOC. With respect to the provision of Halal meals, the food program manager for DOC stated as follows in his declaration:

> All special meals create increased demands on staff. Preparing a few meals for a few inmates is typically as labor intensive as preparing and distributing food in large quantities. Provision of halal meat diets to Muslim inmates would create additional costs, decrease efficiency of the food preparation, and necessitate hiring additional staff members. Additionally, if halal meats were not available through the primary vendor, there are security risks with special delivery services as other providers have not been screened by DOC. As the nutritious and religious needs of Muslim inmates are currently being met, these burdens outweigh the benefits of providing halal meat meals to Muslims at DOC.

(Dkt. #46, Exhibit 3, p. 2). Defendants rely on these statements to support their contention that the impact on prison operations of providing plaintiff with Halal meals would be significant.

Clearly, providing prisoners with any type of special meal will have <u>some</u> impact on the costs of prison operations. As noted by the Supreme Court, however, "[i]n the necessarily closed environment of the correctional institution, few changes will have no ramifications . . . on the use of the prison's limited resources for preserving institutional order." <u>Turner</u>, 482 U.S. at 90. Indeed, the Ninth Circuit also has noted, "[c]ommon sense tells us that there would be some disruption to the efficient operation of culinary services if the prison were required to provide a special meal for one prisoner." <u>Ward</u>, 1 F.3d at 878. This, however, is a far cry from providing the kind of sufficiently specific facts needed to show that the actual impact on prison operations will rise to the magnitude contemplated by the third <u>Turner</u> factor. To

put it another way, defendants have provided little in the way of such facts to show that providing plaintiff with Halal meals will result in more than a *de minimis* impact on the DOC's food operations.

For example, while preparing a few meals for a few inmates may <u>typically</u> be as labor intensive as preparing and distributing food in large quantities, nothing is presented to the Court to indicate that this in fact will be the case with respect to plaintiff's request for Halal meals. The DOC's food program manager concludes that providing Halal meat diets to Muslim inmates would create additional costs, decrease efficiency of the food preparation, and necessitate hiring additional staff members, but does not state, let alone show, with any specificity in what ways or amounts this would be so. The food program manager further states that <u>if</u> Halal meats cannot be obtained through the DOC's primary vendor, there will be security risks with special delivery services, since other providers have not been screened by DOC. However, no indication is given that defendants have even checked with the DOC's primary vendor, or shown what extra costs, if any, would be associated with using and/or screening other providers.

Defendants, in other words, simply have not provided the Court with sufficient facts with which it can ascertain the actual fiscal and other impacts that providing plaintiff with Halal meals will have on the DOC's prison operations. This is true, even keeping in mind that plaintiff has the burden of proving the invalidity of the challenged regulation. That is, while plaintiff ultimately must show the impact on prison operations would be insignificant, defendants at the very least must provide the Court with enough factual specificity to support their claim that the asserted legitimate governmental interests they have put forward to justify their policy are grounded in real fiscal, efficiency or security concerns. The is true as well with respect to the possible provision of Kosher meals as an alternative to a Halal diet.

Concerning the impact of providing Kosher meals to prisoners, the DOC's food program manager does state in his declaration as follows:

> Kosher meals must be prepared in a separate kitchen with separate utensils and cleaning supplies. As such, kosher meals are prepared off-site by an outside vendor and brought into the institution, where they are re-heated and served. The kosher meals cost two to three times as much as mainline meals, such as the ovo-lacto vegetarian meals.

(Dkt. #46-2, Exhibit 3, p. 2). The DOC's religious program manager also stated as follows in regard to the provision of Kosher meals to Muslim prisoners:

> For a short while, Kosher meals were being supplied to Muslim inmates at Twin Rivers Unit (TRU) of the Monroe Correctional Complex (MCC). This practice was stopped as it greatly increased food costs and was unnecessary to meet both the nutritional and religious requirements of Muslim inmates. Kosher requirements are very specialized and far exceed the halal requirements. Kosher meals, for example, are prepared in an independent kitchen with separate utensils.

(Dkt. #46-2, Exhibit 2, p. 3). While it is clear from these statements that it is more expensive in general to provide Kosher meals than ovo-lacto vegetarian meals, and thus this presents a closer call than the above discussion regarding the provision of Halal meals does, it is not entirely clear that providing plaintiff with Kosher meals would necessarily result in a significant cost increase.

Thus, for example, if the DOC already is providing Kosher meals to other prisoners, it may not be overly burdensome to use the kitchen and outside vendor already set up to provide such meals to also provided them to plaintiff. In other words, while providing a type of meal that costs two to three times as much as mainline meals to many prisoners certainly would have a significant fiscal impact, providing an extra such meal to one additional prisoner, or even to only a few additional prisoners, may not be so as compared with the DOC's overall food program budget. Again, no showing has been made on this issue, or on how many Muslim prisoners in general might have to be so accommodated. Further, that providing Kosher meals at one prison institution was costly, does not necessarily mean, without more specific facts, that doing so at plaintiff's former institution, or within the prison system overall, will be.

Accordingly, the undersigned finds, as did the Ninth Circuit in <u>Ward</u> in deciding to remand back to the district court for further findings concerning the impact of providing a Kosher diet, that genuine issues of material fact as to the third <u>Turner</u> factor remain:

> The district court . . . made no findings regarding how great the disruption would be. Indeed, the district court made no findings regarding whether the prison explored the possibility of accommodating [the plaintiff]. Although we must give deference to the prison official's own assessment of the burden on prison operations, we cannot simply accept the warden's assertion . . . that the disruption would be significant. Likewise, the district court made no findings regarding the financial impact of accommodation. Again, it is clear that providing a Kosher diet would give rise to some expense, not only from the cost of . . . meals but also from the cost of accommodating others with similar claims of entitlement to a religious diet. We cannot determine how heavily this factor weighs in the prison's favor, however, because the magnitude of these costs is a factual question for which the district court made no findings.

1 F.3d at 878-79. As such, the third <u>Turner</u> factor weighs in favor of plaintiff, at least with respect to the

1  issue of whether defendants are entitled to summary judgment on this issue.[4]

2            4.    The Fourth *Turner* Factor

3            Under the fourth <u>Turner</u> factor, "'the absence of ready alternatives' to the [challenged] regulation

4  must be explored." <u>Ward</u>, 1 F.3d at 876.  The absence of ready alternatives, furthermore, "is evidence of

5  the reasonableness of a prison regulation." <u>Turner</u>, 482 U.S. at 90.  The Supreme Court did go on to say,

6  however, that:

7            By the same token, the existence of obvious, easy alternatives may be evidence that the
          regulation is not reasonable, but is an "exaggerated response" to prison concerns. This
8            is not a "least restrictive alternative" test: prison officials do not have to set up and then
          shoot down every conceivable alternative method of accommodating the claimant's
9            constitutional complaint. But if an inmate claimant can point to an alternative that fully
          accommodates the prisoner's rights at de minimis cost to valid penological interests, a
10           court may consider that as evidence that the regulation does not satisfy the reasonable
          relationship standard.

11  <u>Id.</u> at 90-91 (internal citation omitted).

12           Defendants argue that giving plaintiff ovo-lacto vegetarian meals <u>is</u> the *de minimis* alternative to

13  providing him with Halal meals, and that no other reasonable alternatives exist that would accommodate

14  plaintiff's request for Halal meals and have a *de minimis* impact on DOC operations.  As discussed above,

15  however, defendants have not set forth a sufficient factual basis for asserting that providing plaintiff with

16  Halal or Kosher meals would significantly affect institutional costs.  Indeed, also discussed above, it does

17  not even appear that defendants have explored other alternatives.  Accordingly, the undersigned is unable

18  to determine whether other reasonable alternatives to the challenged policy exist, or that the policy itself

19

20           [4]Indeed, the district court in <u>Boyd</u> appears to have adopted this reasoning as well: "Defendants have established, generally,
    that simplification of the food preparation process reduces the amount of man hours that must be devoted to that process. Defendants
21  have not, however, offered any evidence to establish that the addition of halal meat to the Muslim religious diet will, in fact,
    necessitate the hiring of additional staff. And, though defendants assert that the use of alternate vendors would increase security
22  risks, defendants offer no proof that alternate vendors would even be necessary. Thus, this assertion is speculative at best. Finally,
    the Court notes that while adding special halal meat to the menu would likely increase costs to the DOC, there is no evidence
23  establishing what those costs would be.
           Defendants have not provided sufficient evidence to establish that incorporating halal meat into the Muslim religious diet
24  would necessitate hiring additional staff, would increase security risks, or would substantially increase the costs of the religious
    meals provide[d] to Muslim inmates. Accordingly, to the extent plaintiff requests that he be provided halal meat as a part of his
25  religious diet, the third *Turner* factor weighs in favor of plaintiff." 2006 WL 1442201 at *7 (internal citation omitted).
           The <u>Boyd</u> court also found that "[s]ubstituting kosher meals for ovo-lacto vegetarian meals" was "unlikely to have a
26  significant impact on staffing requirements because the kosher diet" was "already being provided by the DOC to some inmates."
    <u>Id.</u> On the other hand, the court did find the third *Turner* factor weighed in favor of defendants on the issue of providing Kosher
27  meals on apparently substantially similar evidence as has been presented to this Court regarding the increased cost of a Kosher meal
    as compared to an ovo-lacto vegetarian meal. <u>Id.</u> at *6 and *8. For the reasons set forth above, however, the undersigned finds the
28  facts presented in this case to be insufficient to so find here.

is such an alternative, and, like the Ninth Circuit, "cannot speculate about their existence or the impact they would have on culinary services." <u>Ward</u>, 1 F.3d at 879.

This factor too then tends to weigh in plaintiff's favor, at least with respect to the issue of whether defendants are entitled to summary judgment here. As such, the undersigned is unable to conclude as did the court in <u>Boyd</u> that "defendants' decision to deny plaintiff meals containing halal meat as a part of his religious diet or, in the alternative, kosher meals, is rationally related to a legitimate penological purpose" under the four <u>Turner</u> factors and therefore valid. 2006 WL 1442201 at *8. Rather, the undersigned finds, as did the Ninth Circuit in <u>Ward</u>, that the facts contained in the record simply are insufficient to determine whether the DOC's policy of providing ovo-lacto vegetarian meals to plaintiff violates his right to freely exercise his religious beliefs under the First Amendment.

III.     <u>Genuine Issues of Material Fact Exist as to Plaintiff's Claim Under the Religious Land Use and Institutionalized Persons Act</u>

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") provides in relevant part that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1. The term "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). In addition, in enacting RLUIPA, Congress replaced "the 'legitimate penological interest' standard articulated in *Turner v. Safley* . . . with the 'compelling governmental interest' and 'least restrictive means' tests codified" in RLUIPA. <u>Warsoldier v. Woodford</u>, 418 F.3d 989, 994 (9th Cir. 2005)) (citing <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 716-17 (2005)).

Under RLUIPA, plaintiff "bears the initial burden of going forward with evidence to demonstrate a prima facie claim" that the challenged state action constitutes "a substantial burden on the exercise of his religious beliefs." <u>Id.</u> To be considered a "substantial burden," the challenged state action "must impose a significantly great restriction or onus upon such exercise." <u>Id.</u> at 995. If the inmate is able to

1  meet this burden, the state then must prove that "any substantial burden" on the "exercise of his religious

2  beliefs is *both* 'in furtherance of a compelling governmental interest' *and* the 'least restrictive means of

3  furthering that compelling governmental interest.'" Id. (quoting 42 U.S.C. § 2000cc-1(a), citing 42 U.S.C.

4  § 2000cc-2(b)) (emphasis in original).  In addition, RLUIPA "is to be construed broadly in favor of

5  protecting an inmate's right to exercise his religious beliefs." Id.

6       On the other hand, the Supreme Court has not read RLUIPA as elevating the "accommodation of

7  religious observances over an institution's need to maintain order and safety." Cutter, 125 S.Ct. at 2122.

8  Any accommodation "must be measured so that it does not override other significant interests." Id.  The

9  Supreme Court also has noted that Congress anticipated the courts would apply RLUIPA:

10      [W]ith "due deference to the experience and expertise of prison and jail administrators
        in establishing necessary regulations and procedures to maintain good order, security
11      and discipline, consistent with consideration of costs and limited resources."

12  Id. at 2123 (quoting Joint Statement S7775 (quoting S.Rep. No. 103-111, p. 10 (1993), U.S.Code Cong. &

13  Admin.News 1993, pp. 1892, 1899, 1900)).  Indeed, "prison security is a compelling state interest," and

14  "deference is due to institutional officials' expertise in this area." Id. at 2124 n.13.  Therefore, should an

15  inmate's request for religious accommodation "become excessive, impose unjustified burdens on other

16  institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be

17  free to resist the imposition." Id. at 2125.

18      Defendants argue plaintiff has not met his initial burden of coming forth with evidence to support

19  a *prima facie* case that the DOC's policy of providing him with an ovo-lacto vegetarian meal constitutes a

20  substantial burden on the exercise of his religious beliefs.  This is so, defendants assert, because, as they

21  argued above, plaintiff's religion merely prohibits him from eating non-Halal meat, and he is provided a

22  non-meat diet that is religiously adequate.  As discussed above, however, plaintiff has shown that eating a

23  Halal diet that includes meat is a fundamental tenet of his faith, while defendants have failed to establish

24  definitively that the ovo-lacto vegetarian meals are religiously adequate with respect thereto.  Considering

25  that eating a Halal diet containing meat appears to be essential to plaintiff's religious beliefs, furthermore,

26  the undersigned finds those beliefs have been substantially burdened in this case.[5]

27

28      [5]There appears to be a split among the district courts as to what showing is required by a prisoner to establish his religious
    beliefs have been substantially burdened in this context.  For example, in Phipps, the district court found that because the plaintiff
    had adequately alleged under his First Amendment claim that the defendants' refusal to provide him with Halal meat burdened the

REPORT AND RECOMMENDATION
Page - 22

The burden thus shifts to defendants to prove that the substantial burden placed on the exercise of plaintiff's religious beliefs both furthered a compelling governmental interest and was the least restrictive means of furthering that interest. Defendants argue that such is the case here, because having to provide Halal meat diets to Muslim prisoners would decrease the efficiency of the DOC's food service program, necessitate hiring additional staff, increase costs, and create security risks. Again, however, while prison security is a compelling governmental interest as noted above, defendants have failed to set forth specific facts showing that in this case, providing plaintiff with Halal or Kosher meals would actually result in the adverse impact on prison operations as alleged, or that providing ovo-lacto vegetarian meals is the least restrictive means of furthering that interest. In other words, the record is inadequate to find for defendants as a matter of law on this issue as well.

By the same token though, contrary to plaintiff's argument, the record also lacks a proper specific factual basis for making the opposite finding, i.e., that there is no compelling governmental interest or that the challenged policy is not the least restrictive means of furthering such an interest. Simply asserting in a conclusory manner that there is no compelling interest or that providing ovo-lacto vegetarian meals is not the least restrictive means available, without an adequate evidentiary showing, will not entitle plaintiff to a grant of summary judgment. As such, since neither plaintiff nor defendants have shown they are entitled to judgment as a matter of law on the specific First Amendment and RLUIPA issues discussed above, this matter will be decided on a different legal basis, as explained in further detail below.

IV.    Plaintiff's Fourteenth Amendment Equal Protection of the Law Claim Should Be Denied

The Equal Protection Clause requires that all persons similarly situated be treated similarly by the government. Inmates are protected under the Equal Protection Clause against invidious discrimination. Wolff v. McDonnell, 418 U.S. 539, 556 (1974); Lee v. Washington, 390 U.S. 333, 334 (1968). To set forth a *prima facie* violation of the Equal Protection Clause a plaintiff first must prove a discriminatory

exercise of his religion, he also had made a *prima facie* showing under RLUIPA as well, and the burden shifted to the defendants. 2006 WL 543896 at *9. In Boyd, however, the district court found the plaintiff had failed to make such a showing, because the ovo-lacto vegetarian diet did not require him to eat foods forbidden by his religion, but rather simply denied him one component of the diet which he contended should have been provided, particularly in light of the fact that the defendants made "a significant effort" to provide him and other Muslim prisoners with "a variety of other ways in which to exercise their religious beliefs as well." 2006 WL 1442201 at *10. In light of Congress' intent for the courts to construe RLUIPA broadly in favor of protecting a prisoner's right to exercise his or her religious beliefs, and the fact that plaintiff sincerely believes that eating all Halal foods is a requirement of his faith, the undersigned agrees with the approach taken by the district court in Phipps.

intent or purpose. <u>Village of Arlington Heights v. Metropolitan Housing Dev. Corp.</u>, 429 U.S. 252, 265 (1977); <u>Bagley v. CMC Real Estate Corp.</u>, 923 F.2d 758, 763 (9th Cir. 1991). Conclusory allegations by themselves do not establish an equal protection violation without further proof of invidious discriminatory intent. <u>See</u> <u>Village of Arlington Heights</u>, 429 U.S. at 265.

Plaintiff must "show that he was treated differently from other inmates because he belonged to a protected class." <u>Seltzer-Bey v. Delo</u>, 66 F.3d 961, 964 (8th Cir. 1995); <u>see also</u> <u>Barren v. Harrington</u>, 152 F.3d 1193, 1195 (9th Cir. 1998) (to state claim under section 1983, plaintiff must show intent or purpose to discriminate against him based upon membership in protected class); <u>Wolff</u>, 418 U.S. at 556 (prisoners protected from invidious discrimination based on race); <u>Freeman</u>, 125 F.3d at 737 (inmates protected from intentional discrimination based on religion). The mere fact that plaintiff is a prisoner, however, does not qualify him as being a member of a protected, let alone of a "suspect," class for Equal Protection Clause purposes. <u>Pryor v. Brennan</u>, 914 F.2d 921, 923 (7th Cir. 1990); <u>Moss v. Clark</u>, 886 F.2d 686, 690 (4th Cir. 1989); <u>Thornton v. Hunt</u>, 852 F.2d 526, 527 (11th Cir. 1988).

In the religious exercise context, "[p]risoners enjoy religious freedom and equal protection of the law subject to restrictions and limitations necessitated by legitimate penological interests." <u>Freeman</u>, 125 F.3d at 737 (constitution's equal protection guarantee ensures prison officials cannot discriminate against particular religions). Prison officials, therefore, "must afford an inmate of 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'" <u>Id.</u> (citing to <u>Cruz v. Beto</u>, 405 U.S. 319, 322 (1972)). However, prison officials need not make identical provisions to different faiths, but rather "must make 'good faith accommodation of the [prisoners'] rights in light of practical considerations." <u>Id.</u> Accordingly, plaintiff must show defendants "intentionally acted in a discriminatory manner," although such intent sometimes may be inferred by the mere fact of different treatment. <u>Id.</u> (citing <u>Sischo-Nownejad v. Merced Community College Dist.</u>, 934 F.2d 1104, 1112 (9th Cir. 1991).

Here, plaintiff alleges that defendants violated his equal protection rights by denying him the right to be provided with food that satisfies the requirements of his religious beliefs, that is, with Halal meals, while providing Jewish inmates with Kosher meals consistent with their faith. While perhaps it is true that prisoners who are Jewish are treated differently than those who are Muslims, as defendants admit in

1  their summary judgment motion that those inmates who are Kosher get meat, while those such as plaintiff

2  do not, no evidence has been presented of discriminatory intent.  Plaintiff argues a fair inference can be

3  drawn from the record that the above disparity in treatment was the result of deliberate choice,

4  presumably by the named defendants, although not so specified by plaintiff.

5       The mere fact that a deliberate choice may have been made either by defendants or others within

6  the DOC to provide ovo-lacto vegetarian meals to Muslim prisoners, while providing Kosher meat meals

7  to Jewish prisoners, does not in itself mean that choice was discriminatory in intent.  Indeed, defendants

8  have shown there are valid reasons for treating Jewish prisoners who are Kosher differently from Muslim

9  prisoners who follow a Halal diet.  For example, the requirements for providing Kosher meals are "very

10  specialized and far exceed" those for Halal meals. (Dkt. #46-2, Exhibit 2, p. 3).  As such, Kosher meals

11  must be prepared in a separate, independent kitchen – and thus apparently in one off-site – using separate

12  utensils and cleaning supplies. (Id., Exhibit 2, p. 3, Exhibit 3, p. 2).  Plaintiff does not dispute that this is

13  the case.  As such, he has failed to establish discriminatory intent on the part of defendants, and,

14  therefore, the undersigned finds defendants are entitled to summary judgment on this issue.

15  V.    Defendants Are Entitled to Qualified Immunity

16       Under the doctrine of qualified immunity, state officials "performing discretionary functions [are

17  protected] from liability for civil damages insofar as their conduct does not violate clearly established

18  statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald,

19  457 U.S. 800, 818 (1982); Somers v. Thurman, 109 F.3d 614, 617 (9th Cir. 1997).  To determine whether a

20  state official is entitled to qualified immunity, the Court must perform a two part inquiry.  First, the Court

21  considers "whether the law governing the official's conduct was clearly established." Somers, 109 F.3d at

22  617.  If the law was not clearly established at the time, "the official is entitled to immunity from suit." Id.

23  If it was, the Court next asks whether "under that law, a reasonable official would have believed the

24  conduct was lawful." Id.  An official therefore will denied qualified immunity "only if the law was clearly

25  established and a reasonable official could not have believed the conduct was lawful." Id.

26       The above inquiry "generally turns on the 'objective legal reasonableness' of the action, assessed

27  in light of the legal rules that were 'clearly established' at the time it was taken.'" Grossman v. City of

28  Portland, 33 F.3d 1200, 1208 (9th Cir. 1994) (citing Anderson v. Creighton, 483 U.S. 635, 639 (1987).  To

defeat a claim of qualified immunity, the unlawfulness of the state official's conduct must be "apparent." Id. (citing Anderson, 483 U.S. at 640). This standard "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter v. Bryant, 502 U.S. 224, 229 (1991) (citation omitted); Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001). Such an "accommodation for reasonable error" has been made "because 'officials should not err always on the side of caution' because they fear being sued." Hunter, 502 U.S. at 229 (citation omitted).

Prior to determining whether defendants are entitled to qualified immunity, however, the Court must first determine is plaintiff "has alleged the deprivation of an actual constitutional right at all." Conn v. Gabbert, 526 U.S. 286, 290 (1999). If not, the issue of qualified immunity does not come before the Court. Id. at 293. When making this initial determination, the Court must view the facts "in the light most favorable to the party asserting the injury." Saucier v. Katz, 533 U.S. 194, 201 (2001). Here, as discussed above, although plaintiff has failed to show that his right to equal protection under the law was violated, there are at the very least genuine issues of material fact as to whether his First Amendment right to freely exercise his religion was violated. Accordingly, the undersigned shall address defendants' claim that they are entitled to qualified immunity.

Defendants argue the law supporting plaintiff's claims is not well established. The undersigned agrees. No party has presented, nor has the undersigned found, any Supreme Court or Ninth Circuit cases holding that Muslim prisoners have the right to Halal meals, let alone to Halal meals that include properly prepared meat. To the contrary, the majority of circuit and district courts that have looked at this specific issue have concluded there is no such clearly established right to Halal meals, with or without Halal meat, under the First Amendment's Free Exercise of Religion Clause, RLUIPA or the Equal Protection Clause of the Fourteenth Amendment. See Williams, 343 F.3d at 216-22; Abdullah, 173 F.3d 854; Cochran, 172 F.3d 47; Spruel v. Clarke, 2007 WL 1577729 *3 (W.D. Wash. May 31, 2007); Bilal, 2006 WL 3626808 at *6-*7; Phipps, 2006 WL 543896 at *2; Boyd, 2006 WL 1442201 at *3-*12; Hudson v. Malony, 326 F.Supp.2d 206, 211-14 (D. Mass. 2004) (officials who did not provide Halal meat as part of Muslim diet entitled to qualified immunity); Salaam, 830 F.Supp. at 859-61.[6]

---

[6]Plaintiff argues the law was clearly established at the time, relying on case law which states that prisoners have the right to be provided with food that is sufficient to satisfy their nutritional and religious dietary requirements. However, the inquiry into whether a right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general

1    Given that the law is not clearly established in this area, on this basis alone defendants are entitled

2    to qualified immunity. See Somers, 109 F.3d at 617. It is also the case, furthermore, that, given the lack

3    of clearly established law, and the fact that any unlawfulness on the part of defendants' actions was not

4    apparent, a reasonable DOC or prison official would not have been put on notice that his or her conduct

5    had violated plaintiff's rights. As such, the undersigned finds defendants are immune from liability in this

6    case, and their motion for summary judgment should be granted for that reason.

7    VI.    Plaintiff Is Not Entitled to Injunctive Relief

8    While "the threat of future harm may confer standing on a litigant" to claim injunctive relief, that

9    litigant first "must demonstrate that a 'credible threat' exists that" he or she "will again be subject to the

10   specific injury for which" he or she seeks such relief. Nelsen v. King Co., 895 F.2d 1248, 1250 (9th Cir.

11   1990) (citing Kolender v. Lawson, 461 U.S. 352, 355 n. 3 (1983)). What is necessary in this regard is

12   "[a] reasonable showing of a 'sufficient likelihood'" that the litigant "will be injured again." Id. (citing

13   City of Los Angeles v. Lyons, 461 U.S. 95, 108, 111 (1983)). In other words, "[t]he 'mere physical or

14   theoretical possibility' of a challenged action again affecting" the litigant "is not sufficient." Id. (quoting

15   Murphy v. Hunt, 455 U.S. 478, 482 (1982)). Rather, "[t]here must be a 'demonstrated probability'" that

16   the litigant "will again be among those injured." Id.

17   This "demonstrated probability" has been described as requiring "an individualized showing that

18   there is 'a very significant possibility' that the future harm will ensue" Id. (citation omitted). The Court

19   lacks jurisdiction over the claim absent "a sufficient likelihood of recurrence with respect to the party

20   now before it." Id. at 1251 (citation omitted). In addition, "past exposure to harm is largely irrelevant

21   when analyzing claims of standing for injunctive relief that are predicated upon threats of future harm," if

22   such exposure is "unaccompanied by any continuing present adverse effects." Id. (citation omitted). The

23   Court also "must consider all the contingencies that may arise in the individual case before the future

24   harm will ensue." Id. The burden of showing a likelihood of recurrence of the future harm, furthermore,

25   is "firmly on the plaintiff," and a lack of standing will be found where the claim relies on "a chain of

26

27   proposition." Saucier v. Katz, 533 U.S. 194, 201 (2001). Rather, "the right the official is alleged to have violated must have been

28   'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear
     that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640. As explained
     above, the right alleged to have been violated in this case has not been sufficiently clearly established.

speculative contingencies." <u>Id.</u> at 1251-52 (citation omitted).

Similarly, a claim for injunctive relief is moot where "there is neither a 'reasonable expectation' nor 'demonstrated probability'" that the litigant "will again return" to the correctional institution where the challenged action occurred, i.e., where it is "unlikely" the litigant "will ever again be subject to" such action. <u>Darring v. Kincheloe</u>, 783 F.2d 874, 876 (9th Cir. 1986); <u>see also</u> <u>Johnson v. Moore</u>, 948 F.2d 517, 519 (9th Cir. 1991) (because plaintiff demonstrated no reasonable expectation of returning to prison from which he was transferred, claims for injunctive relief were moot); <u>Dilley v. Gunn</u>, 64 F.3d 1365, 1369 (9th Cir. 1995) (claim that plaintiff might be transferred back to prior institution some time in future was not sufficient to demonstrate reasonable expectation, and therefore was too speculative to prevent mootness). As succinctly explained by the United States Supreme Court:

> "[P]leadings must be something more than an ingenious academic exercise in the conceivable. A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action."

<u>Preiser v. Newkirk</u>, 422 U.S. 395, 403 (1975) (noting further in context of declaratory judgment request that while possibility that challenged agency action might occur in future always exists, such speculative contingencies afford no basis for passing on substantive issues raised) (citations omitted).

In his complaint, plaintiff requests injunctive relief in the form of an order directing defendants to immediately arrange for him to be provided with a Halal diet. (Dkt. #5). Defendants argue plaintiff lacks standing to pursue his claim for injunctive relief, because he is no longer housed at the Washington State DOC institutions where he was formerly incarcerated, but is currently an out-of-state border housed at an institution located in the state of Nevada. (Dkt. #46-2, Exhibit 1, Attachment A). They argue plaintiff's return to where he was formerly housed is speculative, and his transfer to his current place of incarceration renders his claim for injunctive relief moot. In addition, defendants assert plaintiff cannot show he is likely to suffer irreparable injury if the requested relief is not granted, because the persons against whom he seeks such relief do not have contact with him.

Plaintiff counters that it not only is a likely possibility, but a requirement that pursuant to the inter-state compact between the states of Nevada and Washington, at some unspecified time before his release from prison, he must be transferred back to the DOC. Thus, he argues, once he returns to the custody of the DOC, he will continue to be denied the provision of food that satisfies the dietary laws of his religion.

This, however, is precisely the kind of speculative claim the Ninth Circuit and Supreme Court have found, as noted above, to be insufficient to defeat a finding of lack of standing and/or mootness. That is, while it certainly is possible plaintiff will be subject to the DOC's religious dietary policies he is now challenging upon his eventual return to DOC custody, he has neither shown a reasonable expectation or demonstrated probability that this will be so.

First, although he asserts it is a requirement that he be returned to the custody of the DOC prior to his release from prison, plaintiff has presented no actual evidence of any statute, regulation or policy that requires such. Regardless, even if such a requirement does exist, plaintiff appears to have a life sentence, with a release date several decades in the future. See id. Further, as pointed out by defendants, none of them has any current contact with plaintiff, nor is it at all clear they will have any contact with him in the future. Indeed, even if plaintiff is returned to the custody of the DOC at some point in the future, there is nothing to indicate he will be returned to either of the institutions where he was formerly incarcerated, or that any of the named defendants will be in the employ of the DOC.[7] Finally, it also should be noted that given the fact that plaintiff's release date is not likely to occur soon, it is entirely possible that the DOC religious dietary policy may change in the meantime. As such, plaintiff has failed to demonstrate that the injunctive relief he seeks is warranted.

<u>CONCLUSION</u>

Although, as discussed above, there are genuine issues of material fact regarding plaintiff's First Amendment and RLUIPA claims, defendants have met their burden of demonstrating they are entitled to qualified immunity. Plaintiff also has failed to establish his right to equal protection under the law was violated, and has not made a sufficient showing in support of his request for injunctive relief. As such, defendants are entitled to judgment as a matter of law. Accordingly, the undersigned recommends that the court GRANT defendants' motion for summary judgment (Dkt. #46) and DENY plaintiff's motion for summary judgment (Dkt. #47). The undersigned further recommends that for the reasons discussed above, the Court also DENY plaintiff's motion to file a late response brief (Dkt. #53) as being moot, and

---

[7]In addition, given that plaintiff currently is incarcerated as an out-of-state border at a correctional institution in the state of Nevada, there is no evidence to indicate any of the named defendants have the power or authority to grant his request that they "[i]mmediately" arrange for him to be provided with a Halal diet. Indeed, nothing in the record indicates plaintiff currently is unable to receive such a diet at his present place of confinement through the Nevada corrections system.

1  GRANT his motion to file an overlength brief (Dkt. #54).

2      Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedures, the

3  parties shall have ten (10) days from service of this Report and Recommendation to file written

4  objections thereto. See also Fed.R.Civ.P. 6.  Failure to file objections will result in a waiver of those

5  objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit

6  imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **October 12,**

7  **2007**, as noted in the caption.

8      DATED this 18th day of September, 2007.

9

10

11

12                                              Karen L. Strombom
                                                United States Magistrate Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28